STATE OF CONNECTICUT *v.* LLOYD GEORGE
MORGAN, JR.
(AC 21008)
(AC 21301)

Foti, Dranginis and McDonald, Js.

Argued March 19—officially released June 4, 2002

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Robert M. Spector*, special assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Carl E. Taylor*, former supervisory assistant state's attorney, for the appellee (state).

### Opinion

FOTI, J. The defendant in these consolidated appeals, Lloyd George Morgan, Jr., appeals from the judgments of conviction, rendered after a jury trial, of two counts of sale of a narcotic substance by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b)[1] and two counts of sale of narcotics within 1500 feet of a day care center in violation of General Statutes § 21a-278a (b).[2] The defendant also appeals from the judgment of the trial court, rendered following a separate proceeding, that revoked the probation granted to

---

[1] General Statutes § 21a-278 (b) provides in relevant part: "Any person who . . . sells . . . any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. . . ."

[2] General Statutes § 21a-278a (b) provides in relevant part: "Any person who violates section . . . 21a-278 by . . . selling . . . any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising . . . a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section . . . 21a-278. . . ."

him following a 1991 criminal conviction. On appeal, the defendant claims that (1) the court deprived him of his right to present a defense when it refused to admit into evidence a certain laboratory report, (2) the court improperly limited his cross-examination of two of the state's witnesses, (3) the court improperly denied his motion for a sequestration order during a suppression hearing, (4) the evidence did not support the jury's finding that he had sold narcotics within 1500 feet of real property that had been conspicuously identified as a day care center, (5) certain comments made by the prosecutor constituted prosecutorial misconduct and deprived him of his right to a fair trial, and (6) we should set aside the court's finding that he violated the terms of his probation, a finding based on the convictions at issue in these appeals.[3] We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. Between January and March, 1999, members of the New Britain police department were investigating suspected illegal drug transactions at 29 Glen Street in New Britain, an apartment building that was known to be a haven for such activity. To that end, William Steck, an officer with the New Britain police department, enlisted the assistance of Paula Rivera and Edward Clemonts, both confidential informants. Steck met with

[3] At the time he committed the actions underlying his criminal convictions in the present appeals, the defendant was on probation as a result of a 1991 criminal conviction. In regard to his sixth claim, the defendant argues that the court found that he had violated the conditions of his probation solely on the basis of the criminal convictions that are the subject of these appeals. The defendant argues that because we should reverse that judgments of conviction, we should also reverse the court's judgment revoking his probation. Because we affirm the judgment of conviction, that claim has no merit. The revocation court properly concluded that the defendant's convictions in the criminal cases that are the subject of these appeals constituted a violation of the conditions of his probation for the 1991 conviction. See *State* v. *Deptula*, 34 Conn. App. 1, 10–11, 639 A.2d 1049 (1994). Accordingly, we affirm the judgment revoking the defendant's probation.

Rivera and Clemonts on a regular basis, and both individuals had purchased illegal drugs from suspected drug dealers for Steck on several prior occasions. Steck paid Rivera and Clemonts for their assistance.

On February 10, 1999, Steck asked Rivera to present herself at apartment number eight at 29 Glen Street to purchase drugs. Rivera was familiar with the building and with a drug seller in apartment number eight, who she knew as Lloyd. Steck and Rivera drove separately to a parking area located a few blocks away from the building. Steck searched both Rivera's person and her vehicle for drugs. He did not find any and, subsequently, gave Rivera $40 with which to purchase drugs. Rivera drove to 29 Glen Street, parked her vehicle and entered the building. Steck observed her actions from a nearby unmarked vehicle.

Rivera presented herself to the defendant at apartment number eight. The defendant inquired as to what she wanted, and she informed him that she wanted to purchase $40 worth of crack cocaine. She followed the defendant inside the apartment. The defendant's roommate handed the cocaine to the defendant who then handed it to Rivera. After Rivera successfully completed the transaction, she left the building with the crack cocaine and met Steck at the parking lot located a few blocks away. Once there, Rivera related the details of the purchase and delivered the crack cocaine to Steck.

On March 1, 1999, Steck arranged to meet with Clemonts. Steck met Clemonts in an unmarked vehicle and asked him to purchase drugs from apartment number eight at 29 Glen Street. Several blocks from the defendant's building, Steck and Clemonts got out of the vehicle. Steck searched Clemonts' person for drugs. He did not find any. As he had done with Rivera, Steck gave Clemonts money with which to purchase the drugs.

Clemonts walked to the building, and Steck observed him enter and exit the building from the vantage point of his vehicle.

Clemonts knocked on the door to apartment number eight. The defendant answered, and Clemonts indicated that he desired to purchase $20 worth of crack cocaine. After the defendant sold it to him, Clemonts exited the building with the drugs and met Steck in a nearby parking lot. Clemonts described the defendant to Steck, apprised him of the details of the purchase and gave him the crack cocaine.

The jury found the defendant guilty of the crimes with which he stood charged. These appeals followed. Additional facts will be set forth where warranted.

I

The defendant first claims that the court deprived him of his right to present a defense when it refused to admit into evidence a laboratory report that indicated that certain evidence that the police took from his apartment subsequent to his arrest tested negative for the presence of cocaine. We disagree.

The following additional facts underlie the defendant's claim. On March 11, 1999, officers duly executed a search warrant at the defendant's apartment. During their search, they found several of the defendant's important personal papers and his credit card. During cross-examination, the defendant's attorney inquired of Steck as to certain substances that he had seized during the search. Steck testified that during the search of the premises, he or other members of his unit seized trace amounts of a substance that they believed, at that time, may have been cocaine. They recovered the substance from a razor blade and from a turntable in the defendant's medicine cabinet. Steck indicated that either he or a member of his unit conducted a field test of the

substances and that they tested positive for the presence of cocaine.

The state objected to the defendant's foray into that line of questioning, arguing that the substances seized from the defendant's apartment did not provide the basis for the charges against him. The defendant's counsel argued that the evidence was relevant to Steck's state of mind. He posited that Steck had arrested the defendant because he believed that he had found cocaine in the apartment and, therefore, that the defendant must have sold cocaine to Rivera and Clemonts. The court commented that it did not understand the defendant's claim of relevance, as the defendant was "not charged with any wrongdoing on March 11 . . . . So, whether they found cocaine or chewing gum . . . it really doesn't matter . . . ."

The defendant's counsel insisted that the evidence was relevant and that he wanted to introduce, via another witness, the laboratory report indicating a negative test result on those substances. The court permitted Steck to testify in response to examination by defense counsel that he or members of his unit had field tested those substances and that they tested positive at that time for the presence of cocaine. During the defendant's case-in-chief, his counsel proffered a laboratory report issued by the state toxicological laboratory. The report indicated that those substances had tested negative for the presence of cocaine in tests performed at the laboratory. The state objected on the ground of relevancy. The defendant's counsel argued that the report challenged the "credibility of the confidential informants."

The court ruled that the laboratory report was not relevant to any issue before the jury. The court emphasized that regardless of what police investigators may have thought that they had found on March 11, 1999, it had no bearing on the alleged offenses that the defen-

dant stood charged with having committed on either February 10 or March 1, 1999. Likewise, the court ruled that the proffered evidence did not bear on the jury's assessment of the credibility of the state's witnesses. As the court explained, those events did not "have any direct bearing or even indirect bearing [on] the credibility of the confidential informant witnesses. The jury will judge their credibility based on the testimony which relates to the matters with which we are concerned. The alleged offenses on February 10 and March 1."

The defendant now claims that the court deprived him of his right to present a defense under the sixth amendment to the United States constitution,[4] which is applicable to the states through the fourteenth amendment,[5] and under the due process clause of article first, § 8, of the constitution of Connecticut.[6] The defendant preserved his evidentiary claim at trial, but concedes, however, that he did not preserve his constitutional claim at trial. The defendant now argues that the disallowed evidence "was crucial to [his] defense that the confidential informants lied when they identified [him] as the drug seller, and it was highly relevant

---

[4] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

[5] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[6] The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf . . . and in all prosecutions . . . to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

. . . that they could have purchased drugs at any of the surrounding apartments within [his] building." Furthermore, the defendant claims that once the court permitted Steck to testify that the substances field tested positive as cocaine, the jury was left with the mistaken impression that the defendant's apartment contained cocaine when police investigators searched it on March 11, 1999.

We first set forth our standard of review. "A trial court's ruling on the admissibility of evidence is afforded great deference. . . . The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Valentine*, 255 Conn. 61, 69, 762 A.2d 1278 (2000).

We dispose of the defendant's claim because we conclude that the laboratory report was not relevant to the issues before the jury. It is well settled that "[t]he proffering party bears the burden of establishing the relevance of the offered [evidence]. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Casanova*, 255 Conn. 581, 591, 767 A.2d 1189 (2001). "We have often stated that [e]vidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . . One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable." (Internal quotation marks omitted.) *State* v. *Watson*, 26 Conn. App. 151, 156, 599 A.2d 385 (1991), cert. denied, 221 Conn. 907, 600 A.2d 1362 (1992). Further-

more, "it is the court's right and, indeed, its duty to exclude irrelevant evidence." Id.

The laboratory report was not relevant to the issues before the jury, namely, whether the defendant had sold cocaine to Rivera and Clemonts.[7] The details of the police search of the defendant's apartment days after those sales occurred were of no consequence to the jury's analysis. We fail to see the logic of the defendant's argument that the laboratory report would somehow have implicated the credibility of either the confidential informants or Steck. The defendant argues that the evidence would have established "that the police relied solely on the informants in arresting [him], and that the informants could have lied and obtained the drugs from any of the surrounding apartments." If that was the defendant's defense, the court's exclusion of the laboratory report certainly did not affect his ability to set it forth at trial. No evidence demonstrated that either Rivera or Clemonts had any connection whatsoever to the report or the substances described therein. Steck testified that he lacked knowledge of the laboratory report. The report did not bear on anyone's credibility because it was not relevant to the events described at trial. Likewise, even if the defendant had uncontroverted evidence demonstrating that he did not have cocaine in his apartment either before or after the alleged sales to Rivera and Clemonts, the report would still be inadmissible because it was irrelevant. Accordingly, the exclusion of the report did not result from an abuse of discretion.

Having reached that conclusion, we necessarily find that the defendant's attempt to give the court's evidentiary ruling constitutional significance is to no avail. The defendant did not claim that the court's action

[7] We note that the defendant did not dispute that the substances allegedly sold to Rivera and Clemonts were cocaine.

deprived him of his right to present a defense at trial, and he now seeks review of the claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] Review under *Golding* is not warranted because the defendant's claim is evidentiary in nature and is not of constitutional magnitude. See *State* v. *Toccaline*, 258 Conn. 542, 550, 783 A.2d 450 (2001); *State* v. *Whipper*, 258 Conn. 229, 279, 780 A.2d 53 (2001). A defendant's right to present a defense guarantees his or her right, to be exercised within limits, to present *relevant* evidence. See *State* v. *Porter*, 241 Conn. 57, 133–34, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998); *State* v. *Jones*, 46 Conn. App. 640, 646, 700 A.2d 710, cert. denied, 243 Conn. 941, 704 A.2d 797 (1997). That right is not implicated here.

The defendant also claims that the court improperly "left [the jury] with the mistaken impression that [he] did in fact have cocaine in his apartment when it was searched by the police." The defendant argues that Steck's testimony as to the field test "clearly prejudiced" his case. The record reflects that the state did not question Steck as to the substances that field tested positive for cocaine during the March 11, 1999 search. The defendant inquired as to that evidence, over the state's timely objection, during his cross-examination of Steck. The court permitted the defendant to inquire as to the field test, but informed the defendant's counsel that he would not be able to get the subsequent test results into evidence through Steck. After the court

---

[8] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

ruled that the report was irrelevant, the defendant did not request the court to strike Steck's testimony insofar as it concerned the field test, nor did he ask the court for a curative instruction in regard to that testimony. The testimony complained of here was elicited through careful cross-examination. The defendant made a tactical decision to delve into that irrelevant subject and cannot now complain that the court improperly permitted him to do so. See *State* v. *Brokaw*, 183 Conn. 29, 32–33, 438 A.2d 815 (1981); *State* v. *Harrison*, 34 Conn. App. 473, 488, 642 A.2d 36, cert. denied, 231 Conn. 907, 648 A.2d 157 (1994).

## II

The defendant next claims that the court deprived him of his right to confront adverse witnesses when it limited potential areas of cross-examination as to Rivera and Clemonts. We disagree.

The following additional facts underlie the defendant's claim. The state filed a motion in limine seeking to limit the defendant's inquiry into the prior felony convictions of its witnesses. The state also objected to certain areas of inquiry during the defendant's cross-examination of Clemonts and Rivera. Before addressing the defendant's claim, we first examine the specific parameters of the court's ruling on the motion in limine.

The state represented that Clemonts had several prior felony convictions.[9] The court ruled that the defendant could cross-examine Clemonts as to any felony convictions from 1995 and later, and that the defendant could

[9] The state represented that Clemonts had the following prior felony convictions: Possession of narcotics, December 8, 1999; conviction of two counts of sale of narcotics or possession of narcotics with intent to sell, May 12, 1998; possession of narcotics, October 31, 1997; robbery in the third degree, August 29, 1997; conspiracy to commit burglary in the third degree, August 29, 1997; burglary in the third degree, April 25, 1995; burglary in the third degree, December 17, 1991; misrepresentation of a controlled substance, May 16, 1990; and conspiracy to sell narcotics, September 27, 1989.

refer to those convictions by name. During the defendant's cross-examination of Clemonts, the state sought to preclude the defendant from inquiring as to whether Clemonts had received favorable sentences from the court for any of his prior convictions because of his cooperation with the police and whether he had paid income taxes on the moneys that he earned when he worked as an informant for the police. The court permitted the defendant to inquire as to the favorable treatment, but precluded him from inquiring as to the payment of taxes.

In regard to Rivera, the defendant sought permission to inquire into two specific acts of misconduct. Specifically, he wanted to inquire into an incident in 1988 when Rivera allegedly filed a false police report and an incident in 1995 that the defendant described as larceny by false pretenses.[10] The court disallowed questioning as to those incidents, concluding that they were not felony convictions and were too remote in time. The court also precluded the defendant from inquiring as to whether Rivera paid income taxes on the money that she had received from her undercover work with the police.

On appeal, the defendant argues that the court's ruling precluded him from introducing evidence that related to the truth and veracity of the witnesses, an issue crucial to his defense. He argues that the court infringed on his rights under the confrontation clause of the sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut.[11] The defendant's claim implicates two types of evidence that a party may use to impeach a witness' credibility, prior convictions and specific acts of misconduct.

---

[10] The parties agree that those acts resulted in misdemeanor convictions.

[11] See footnotes 4, 5 and 6.

"[T]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . This right, however, is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The trial court, in its discretion, may impose limitations on the scope of cross-examination, as long as the defendant has been permitted sufficient cross-examination to satisfy constitutional requirements. . . . The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited and the right to cross-examine is subject to the duty of the court to exclude irrelevant evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 65 Conn. App. 449, 457–58, 783 A.2d 53, cert. denied, 258 Conn. 927, 783 A.2d 1032 (2001).

"Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Internal quotation marks omitted.) *State* v. *Gould*, 241 Conn. 1, 16, 695 A.2d 1022 (1997). "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32 (1992). "The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quota-

tion marks omitted.) *State* v. *Williams*, supra, 65 Conn. App. 458.

"We traditionally apply a two part analysis to determine whether a party has been deprived of effective cross-examination. First, we determine whether the defendant received the minimum opportunity for cross-examination of adverse witnesses required by the constitution. . . . If so, we then consider whether the trial court's restriction of cross-examination amounted to an abuse of discretion under the rules of evidence." (Internal quotation marks omitted.) *State* v. *Otto*, 50 Conn. App. 1, 6, 717 A.2d 775, cert. denied, 247 Conn. 927, 719 A.2d 1171 (1998).

We review the court's evidentiary rulings with great deference. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Hall*, 66 Conn. App. 740, 755, 786 A.2d 466 (2001), cert. denied, 259 Conn. 906, 789 A.2d 996 (2002). Having set forth those general principles of review, we turn to the defendant's claims.

A

The defendant first claims that the court deprived him of his right to cross-examine Clemonts. He points out that the court precluded him from inquiring as to (1) Clemonts' felony convictions in 1989, 1990 and 1991, (2) the specific acts underlying his 1990 conviction for misrepresentation of a controlled substance and his

1991 conviction for conspiracy to commit burglary, and (3) whether he paid income taxes on the money that he earned when he purchased drugs as an informant for the police.

We conclude that the court's rulings did not unduly restrict the defendant's right to cross-examine Clemonts. The record reflects that the defendant examined Clemonts as to all of his post-1995 felony convictions. The defendant's counsel referred to those convictions by name. The defendant also cross-examined Clemonts as to the specific sentences that he had received for each of those convictions. As a result of vigorous cross-examination, Clemonts admitted that he had received favorable treatment because of his work as a confidential informant for the New Britain police department. Further, the defendant elicited from Clemonts that his ability to purchase drugs for the police and to testify favorably against alleged drug sellers not only had led to his receiving lenient sentences, but that he derived a significant source of his income from doing so.

Viewing the cross-examination as a whole, we conclude that the defendant had ample opportunity to expose any potential motive to fabricate or to expose any bias underlying Clemonts' testimony. The defendant had ample opportunity to cross-examine the witness and clearly elicited from him that his relationship with the New Britain police department was a benefit to him. Likewise, the defendant cross-examined the witness in regard to his felony convictions for burglary and robbery as well as his felony narcotics convictions. Additionally, the defendant not only had the opportunity to, but did in fact, effectively expose Clemonts' criminal character.

We further conclude that the court's rulings did not constitute an abuse of discretion. "Effective cross-examination does not include eliciting or presenting

evidence that is immaterial or irrelevant. . . . When the trial court properly excludes evidence as irrelevant, it does not abuse its discretion in limiting cross-examination as to the excluded evidence." (Citation omitted.) *State* v. *Otto*, supra, 50 Conn. App. 6–7.

With regard to prior criminal convictions, the rule is that "[t]he credibility of a witness may be attacked by introducing the witness' conviction of a crime if the maximum penalty for that conviction is imprisonment exceeding one year. . . . Recognizing that the inherent authority of the trial court to exclude evidence where its prejudicial tendency outweighs its probative value is particularly applicable to prior convictions otherwise qualifying for admission . . . [t]hree factors have usually been identified as of primary importance in considering whether a former criminal conviction is to be admitted: (1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time. . . . Moreover, [a]lthough we have left to the trial court the responsibility for determining whether, in a particular case, a witness' criminal conviction may be excluded on the grounds that it is too old, we have sanctioned a general guideline for the determination of remoteness that parallels rule 609 (b) of the Federal Rules of Evidence. Rule 609 (b) establishes a ten year limitation from conviction or release from resulting confinement upon the use of the conviction for impeachment purposes unless the probative value of the conviction substantially outweighs its prejudicial effect. . . . We have recognized, however, that convictions having some special significance upon the issue of veracity surmount the standard bar of ten years and qualify for the balancing of probative value against prejudice. . . . Finally, [w]e will not disturb the trial court's determination as to the admissibility of a prior conviction to impeach a witness absent an abuse of

discretion . . . and a showing by the defendant of substantial prejudice or injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Askew*, 245 Conn. 351, 360–61, 716 A.2d 36 (1998); see also Conn. Code Evid. § 6-7.

Our courts have further segregated prior convictions that are admissible for impeachment purposes into two general categories. "First are those crimes that by their very nature indicate dishonesty or tendency to make false statement. . . . Beyond the obvious violations such as perjury or false statement, we have recognized that crimes involving larcenous intent imply a general disposition toward dishonesty such that they also fall within this category. . . . Convictions of this sort obviously bear heavily on the credibility of one who has been convicted of them. . . .

"The second category involves convictions for crimes that do not reflect directly on the credibility of one who has been convicted of them. . . . The theory behind the admissibility of these convictions as evidence of credibility posits that conviction of a crime demonstrates a bad general character, a general readiness to do evil and that such a disposition alone supports an inference of a readiness to lie in the particular case . . . . Convictions of crimes that fall within this second category blemish the character of one so convicted. A juror might reasonably conclude that such a witness lacks to some degree the moral rectitude from which a witness' oath of honesty derives its credibility." (Citations omitted; internal quotation marks omitted.) *State* v. *Geyer*, 194 Conn. 1, 12–13, 480 A.2d 489 (1984).

The rule with regard to inquiry into a witness' prior bad acts, separate from proof of conviction, is somewhat similar. "The right to cross-examine a witness concerning specific acts of misconduct is limited in three distinct ways. First, cross-examination may only

extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the issues of veracity . . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible." (Citations omitted; internal quotation marks omitted.) *State* v. *Martin*, 201 Conn. 74, 85–86, 513 A.2d 116 (1986); see also Conn. Code Evid. § 6-6 (b).

The court's exclusion of Clemonts' 1989 conviction for conspiracy to sell narcotics, his 1990 conviction for misrepresentation of a controlled substance and his 1991 conviction for conspiracy to commit burglary resulted from a proper exercise of discretion. The court properly stated that the right to inquire as to a witness' prior convictions, even those within the ten year period, is not absolute. The court stated: "I make the ruling on whether they are of probative value on the issue of credibility only. That's for the court to decide."

Having heard the defendant's proffer as to those convictions, the court concluded that any conviction prior to 1995 was not relevant in assessing Clemonts' credibility. The court stated: "In the view of this court, they have little probative value or, certainly, little additional probative value on the issue of credibility." As to the other felony convictions, the court explained that they "[had] direct bearing on the honesty and integrity and credibility of the witness, as well as his engagement in the sale and possession of narcotics. The underlying criminality . . . relates to [his] integrity and credibility." Contrary to the defendant's assertion on appeal, the court did not base its decision solely on the remoteness factor.

The court also ruled that the defendant could not inquire into any of the specific acts of misconduct that

resulted in Clemonts' pre-1995 convictions. The defendant argues that the court improperly excluded inquiry into those acts of misconduct, apart from the convictions occasioned by them. The court stated specifically that those acts were "much too remote in time" and implicitly determined that they would have been of no probative value in cross-examination. We are unable to conclude that this evidentiary ruling resulted from an abuse of discretion. The court was free to conclude that inquiry into the acts underlying Clemonts' convictions for misrepresentation of a controlled substance and conspiracy to commit burglary merely were cumulative evidence of other evidence that the court deemed admissible in regard to Clemonts' credibility. Although inquiry into those acts might have borne on the issue of Clemonts' credibility, the court was free to determine, as it did, that the remoteness of the acts tended to outweigh their probative value.

The court also precluded the defendant from asking Clemonts if he had paid income taxes on the money he earned while working for the police. Despite the fact that our Supreme Court has held that questions asked of a witness regarding whether he or she has cheated on his or her income taxes may be permissible to demonstrate a lack of veracity; see *State* v. *Sharpe*, 195 Conn. 651, 658–59, 491 A.2d 345 (1985); such questions are not permissible automatically. We will not second-guess the court's evidentiary ruling in that regard, having been made, as it was, following the introduction of ample evidence related to Clemonts' credibility. We conclude that the court's ruling reflected a proper balance of how much inquiry into the defendant's prior conduct or criminal character reasonably was necessary for the jury to assess his credibility.

## B

We now turn to the defendant's claim with regard to his cross-examination of Rivera. As we discussed

previously, the defendant sought to inquire of Rivera as to two alleged prior acts of misconduct. Those were two misdemeanor convictions, one from 1988 and the other from 1995, allegedly involving Rivera's having made a false statement to the police and having somehow defrauded the city of New Britain of $600. The court also precluded the defendant from inquiring of Rivera as to whether she had paid income taxes on the money that she earned while working for the New Britain police department as an undercover informant. The defendant argued that those acts were relevant to the jury's ability to evaluate Rivera's testimony.

The record reflects that the defendant had an ample opportunity to cross-examine Rivera at trial. The defendant elicited from Rivera the fact that she was very friendly with Steck, and the fact that she derives income when she purchases drugs for the police and for "[telling] the police officer what the police officer wants to hear" concerning the transaction. The defendant also inquired of Rivera as to whether she assisted the police to receive special treatment in the event that she found herself in trouble.

In addition to examining Rivera at length as to her version of the events underlying these appeals, the defendant adequately examined Rivera as to her credibility. Contrary to the defendant's arguments, the court's evidentiary rulings did not deprive him of his constitutional right to cross-examine this adverse witness. As we have stated, a defendant's right to cross-examine a witness against him or her is not violated when the court excludes immaterial or irrelevant evidence. *State* v. *Otto*, supra, 50 Conn. App. 6–7.

We further conclude that the court's rulings did not reflect an abuse of discretion or an improper application of our rules of evidence. After hearing the proffered evidence, the court clearly noted that it did not find

that the evidence had probative value. The court also stated that insofar as those acts resulted in misdemeanor convictions, it believed that their remoteness weighed against their admissibility. The court was in the best position to evaluate the proposed inquiry and to gauge its effect on the jury. Although any bad acts certainly might bear on an assessment of a witness' credibility, the court remains in a superior position to make that determination in a particular case after considering the specific acts in question. Likewise, we cannot say that precluding inquiry into whether Rivera paid income taxes on the money she earned from working with the police represented an abuse of discretion. We will not upset the court's conclusion that the relevance of those acts in the jury's assessment of Rivera likely was outweighed by their remoteness, their prejudicial effect on the jury or the likelihood that permitting such inquiry might have confused the jury.

### III

The defendant next claims that the court improperly denied his motion for a sequestration order during the suppression hearing and that this action should result in an automatic reversal of the judgment of conviction. We disagree.

The record reflects that prior to trial, the defendant filed a motion to suppress the photographic identifications of him made by Clemonts and Rivera. The defendant argued that the photographic arrays were suggestive and unreliable. The court conducted a suppression hearing over the course of two days. Steck testified as to the manner in which he organized the purchases of the crack cocaine by Clemonts and Rivera. He also testified as to the manner in which he assembled a photographic array, and the manner in which Clemonts and Rivera later identified the defendant as the

person from whom they had purchased the crack cocaine.

At the conclusion of Steck's examination, the defendant filed a motion for a sequestration order, seeking to prevent Steck from being present in the courtroom. The defendant's counsel argued: "I don't know if Officer Steck's presence will add or subtract from the testimony of . . . Clemonts, the next state's witness." The defendant's counsel further argued that he was concerned that Steck's presence might have a "chilling effect" on Clemonts' testimony. The court observed that the proceeding merely was a hearing on a motion, not the trial itself, and it denied the motion.

We begin our review of the court's action by looking to the language of the controlling statute. General Statutes § 54-85a provides: "In any criminal prosecution, the court, upon motion of the state or the defendant, shall cause any witness to be sequestered during the hearing on any issue or motion or any part of the trial of such prosecution in which he is not testifying." Either party may invoke the court's authority to issue a sequestration order during any portion of the trial; the court lacks discretion to deny such a request. See *State* v. *Robinson*, 230 Conn. 591, 598–99, 646 A.2d 118 (1994). The court, therefore, improperly denied the defendant's request for a sequestration order.

Our analysis of the claim, however, does not end here. The defendant posits that the court's failure to grant the motion "should result in automatic reversal or, at the very least, the state should have the burden of proving harmlessness." The state argues that the defendant bears the burden of establishing the harm or prejudice, if any, that resulted from the court's action and that he has failed to do so. We agree with the state.

It is well settled that a violation of a sequestration order does not automatically require a new trial. Our

courts have consistently held that "[i]f the trial court fails to observe its own sequestration order, the burden is on the party requesting sequestration to show prejudice." *State* v. *Paolella*, 211 Conn. 672, 681, 561 A.2d 111 (1989); see also *State* v. *Robinson*, supra, 230 Conn. 599; *State* v. *Lowe*, 61 Conn. App. 291, 296, 763 A.2d 680 (2001). Under that requirement, the defendant bears the burden of demonstrating that "the prejudice resulting from the violation is likely to have affected the jury's verdict . . . ." *State* v. *Robinson*, supra, 599.

Although the defendant acknowledges those principles, he argues that they apply in cases in which a court properly has issued a sequestration order that is later violated, but not in the present situation where the court improperly failed to issue a sequestration order when it should have done so. The defendant's distinction in that regard does not affect our analysis.

The defendant in *Paolella* was convicted of kidnapping in the second degree with a firearm and assault in the third degree in connection with an incident involving the complainant, his estranged wife. The trial court improperly exempted the complainant from a sequestration order, thereby permitting her to remain in the courtroom after she testified and while her children testified in regard to the incident. Despite the fact that the court had issued a sequestration order for all witnesses, the court permitted the complainant to remain in the courtroom after she testified for the benefit of her young children. *State* v. *Paolella*, supra, 211 Conn. 680.

In reviewing the court's exclusion of the complainant from its order, our Supreme Court looked to whether the defendant had met his burden of demonstrating that the court's action caused him prejudice. Id., 681. On the basis of the fact that the complainant had testified and therefore was "unable to tailor her testimony to correspond to that of her children," our Supreme Court

held that the defendant had failed to demonstrate that the trial court's action caused him prejudice. Id.

Likewise, the trial court in *Robinson* improperly exempted two state's witnesses, both correction officers, from a previously issued sequestration order. *State v. Robinson*, supra, 230 Conn. 595. Again, our Supreme Court required the defendant to prove that the court's action in exempting witnesses from a sequestration order, over the defendant's timely objection, caused him prejudice. Id., 599.

We conclude that just as in cases in which a court violates § 54-85a by improperly permitting witnesses to testify or to remain in a courtroom during proceedings in contravention of an earlier sequestration order, a defendant must show that a court's failure to issue a sequestration order under the statute caused him or her prejudice. We can discern no reason to apply a different rule to the latter situation when the consequences of the statute's misapplication are identical.

We further hold that the defendant has not demonstrated any prejudice as a result of the court's action. The defendant attempts to demonstrate such prejudice by arguing that Clemonts might have testified differently at the suppression hearing had Steck not been present. Also, the defendant claims that there were differences between Steck's testimony at the suppression hearing and his testimony at trial, and that such differences occurred because Steck altered his testimony to more closely resemble Clemonts' testimony at the suppression hearing.

First, we observe that the defendant requested a narrow sequestration order. He sought only to achieve Steck's absence from the courtroom during Clemonts' testimony at the suppression hearing. Even if the court properly had granted the request, it would only have precluded Steck from being in the courtroom during the

remainder of the suppression hearing. In other words, Steck could very well have reviewed a transcript of Clemonts' testimony after the suppression hearing, or have learned of Clemonts' testimony from another source, prior to testifying at trial. The record reflects that the defendant did not request a sequestration order to prevent Steck from learning the substance of Celmonts' testimony, by reviewing a transcript of the proceedings or otherwise, either at the hearing or at any time thereafter.[12] The defendant cannot prove that a sequestration order would have precluded any changes in Steck's testimony at trial.

Second, we note that Steck testified before Clemonts at the suppression hearing itself. "The primary purpose of a sequestration order is to ensure that the defendant receives a fair trial by preventing witnesses from shaping their testimony to corroborate falsely the testimony of others." (Internal quotation marks omitted.) *State* v. *Lowe*, supra, 61 Conn. App. 297. As was our Supreme Court in *Robinson*, we are persuaded that the trial court's improper application of the statute could not, in any way, have induced tailored testimony from the witness who should not have been in the courtroom.

The defendant also argues that Steck's presence in the courtroom during the suppression hearing might have influenced Clemonts' testimony. Again, we note that the defendant bears the burden of demonstrating prejudice arising from that allegation, and he has not done so. The record reflects that Clemonts had a long history of acting as an undercover informant for the New Britain police department. The defendant, during vigorous cross-examination, elicited from Clemonts the facts that he derived income from his activities with

---

[12] The defendant did not file a motion for such an order at any time during the trial itself. That failure leads us to assume that at least prior to and during the trial, the defendant did not believe that the court's ruling caused him the harm of which he now complains.

the department, received lenient sentences from the court in exchange for his work with the department, and had an ongoing relationship with Steck and members of the department. Given Clemonts' role in the proceedings and his history of testifying for the state, the defendant's argument that Steck somehow influenced Clemonts to testify in a certain way is purely speculative.

## IV

The defendant next claims that his conviction under § 21a-278a (b) cannot stand because the state failed to prove that he sold narcotics within 1500 feet of "a licensed child day care center . . . that is identified as a child day care center by a sign posted in a conspicuous place," as is required under the statute. We disagree.

Initially, we note that the defendant failed to raise his sufficiency of the evidence claim before the trial court. The defendant seeks review of his claim under *State* v. *Golding,* supra, 213 Conn. 239–40. See footnote 8. We will afford review to the defendant's claim.

"Unpreserved sufficiency claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime upon insufficient proof. . . . Our Supreme Court has stated that *Jackson* v. *Virginia,* [443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)], compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding. State* v. *Adams,* 225 Conn. 270, 275–76 n.3, 623 A.2d 42 (1993)." (Citation omitted; internal quotation marks omitted.) *State* v. *Jefferson,* 67 Conn. App. 249, 254–55, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002); see also *State* v. *Trotter,* 69 Conn. App. 1, 4–5, 793 A.2d 1172 (2002).

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 517, 782 A.2d 658 (2001).

To sustain a conviction under § 21a-278a (b), given the facts of the present case, the state needed to prove that (1) the defendant sold a controlled substance, (2) he did so within 1500 feet of the real property comprising a licensed day care center as defined in General Statutes § 19a-77 and (3) the facility was identified as a child day care center by a sign posted in a conspicuous place. General Statutes § 21a-278a (b). Section 19a-77 (a) (1) provides in relevant part that a child day care center "offers or provides a program of supplementary care to more than twelve related or unrelated children outside their own homes on a regular basis . . . ."

At trial, the jury heard testimony from Patrick Toscano, a licensed surveyor. Toscano testified that the defendant's apartment building was approximately forty-five feet across Glen Street from a YWCA facility. The jury also heard testimony from Kathy Lynn Coyle, the executive director of the YWCA facility. Coyle testified that since 1989, the facility has housed a day care center that provides care for children between the ages of six weeks and fifteen years. Coyle testified that in February, 1999, workers at the center provided services to more than 100 children a day. Coyle further testified that beginning in the latter part of 1998 and through

the time of the events underlying these appeals, the facility was adorned with a large banner to promote the day care center. The state introduced a photograph of the banner, which read in part: "YWCA Child Care: Superior Pre School for 3 and 4 year olds. Call today!" The banner also displayed the center's telephone number.

The gist of the defendant's argument is that the banner merely was a promotional display "for one to get information about the YWCA's preschool, which could actually be provided at a variety of places within the city. It does not inform the reader that a 'child day care center' is actually located in that building." We conclude that the evidence of the banner's display on the facility satisfied the state's burden of proving that the facility conspicuously was identified by a sign as a day care center.

The statute does not require the use of certain language on the posted sign. Whether a posted sign satisfies § 21a-278a (b) is a question of fact. In the present case, the jury viewed a photograph of the banner that contained the phrases "YWCA Child Care" and "Superior Pre-School for 3 and 4 year olds." Furthermore, the jury heard evidence that the sign was displayed on a YWCA facility. Applying the common sense and experience of the affairs of life that members of the jury bring to their fact-finding function; State v. Guadalupe, 66 Conn. App. 819, 826, 786 A.2d 494 (2001), cert. denied, 259 Conn. 907, 789 A.2d 996 (2002); they logically could have found that the banner adequately identified the building as housing a child day care center. Furthermore, the jury reasonably could have concluded that the banner fulfilled that function in a conspicuous manner. Accordingly, sufficient evidence supported the defendant's conviction under § 21a-278a (b).

## V

Finally, the defendant claims that certain of the prosecutor's comments during closing argument to the jury rose to the level of prosecutorial misconduct and that such comments deprived him of his right to a fair trial. He claims that the challenged remarks fall into five categories of improper argument: (1) expressions of opinion of the credibility of witnesses, (2) expressions of opinion that the defendant was guilty, (3) appeals to the emotions, passions and prejudices of the jury, (4) attempts to dilute the state's burden of proof and (5) comment on the defendant's choice not to testify. We conclude that the prosecutor's comments did not deprive the defendant of his right to a fair trial.

"When presenting closing arguments, as in all facets of a criminal trial, the prosecutor, as a representative of the state, has a duty of fairness that exceeds that of other advocates. [A] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury. . . . [B]y reason of his [or her] office, [a prosecutor] usually exercises great influence upon jurors. His [or her] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because [a prosecutor] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. . . .

"Prosecutorial misconduct may . . . occur in the course of closing argument. . . . Such argument may be, in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the

culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . .

"[T]o determine whether claims of prosecutorial misconduct amounted to a denial of due process, we must decide whether the challenged remarks were improper, and, if so, whether they caused substantial prejudice to the defendant. . . . To make this determination, we must focus on several factors: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 61 Conn. App. 763, 769–70, 765 A.2d 1240, cert. denied, 256 Conn. 901, 772 A.2d 599 (2001).

Because the defendant did not object to the alleged instances of prosecutorial misconduct at trial, he may prevail on his claim only if he satisfies all four prongs of the analysis set forth in *State* v. *Golding*, supra, 213 Conn. 239–40.[13] The record is adequate for review of the claims, and the claims are of constitutional magnitude alleging the violation of a fundamental right. Accordingly, we must determine whether the defendant has satisfied *Golding*'s third prong, that is, whether a constitutional violation clearly exists and clearly deprived him of a fair trial. Consonant with the standard of review previously detailed, we will set forth each of the defendant's claims of impropriety in turn to determine if, under the standard applicable to each, the remarks rose to the level of prosecutorial misconduct. We then will determine, if such misconduct exists, whether it so

---

[13] See footnote 8.

prejudiced the defendant as to deny of him of his due process rights.

As a preliminary matter, we note that the prosecutor made all of the allegedly improper remarks during his rebuttal argument. The defendant, therefore, cannot claim that the prosecutor engaged in "a pattern of egregious conduct"; *State* v. *Holmes*, 64 Conn. App. 80, 92, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001); during the entire trial. See also *State* v. *Johnson*, 65 Conn. App. 470, 483, 783 A.2d 1057 (fact that claims focused on remarks made only during closing argument demonstrated that comments were not pervasive quality of proceeding), cert. denied, 258 Conn. 930, 783 A.2d 1031 (2001). We also find it significant that the defendant failed to object to any of the prosecutor's remarks at trial. See *State* v. *Denson*, 67 Conn. App. 803, 815, 789 A.2d 1075 (failure to object to allegedly improper argument often indicates that counsel did not " 'view the remarks as so prejudicial that his client's right to a fair trial was seriously jeopardized' "), cert. denied, 260 Conn. 915, 797 A.2d 514 (2002).

A

The defendant first claims that the prosecutor improperly vouched for the credibility of Clemonts and Rivera. The prosecutor first pointed out that Rivera knew the defendant and then commented as to her ability to identify him accurately, stating: "She knew the defendant. There's no question as to what her identification was." The prosecutor also commented on the questions asked of both informants during their cross-examination. He expressed his belief that the defense counsel never challenged successfully the heart of the case, that the witnesses purchased crack cocaine from the defendant. He stated: "I submit to you that these people testified truthfully as to what they bought from the defendant."

The prosecutor also stated: "Who are the types of people that [the defendant] sold drugs to? Who are the type of people that [the police] bring in? To their credit, Mr. Clemonts and Miss Rivera came here and told you what happened on those days. And I submit to you, they told it in a credible and believable manner. And there's nothing [that has] been presented to rebut it, and there's nothing presented to show a bias."

"It is well settled that [a] prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses . . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions. . . . The prosecutor may, however, argue to the jury that the *evidence* and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Rivera*, supra, 61 Conn. App. 775.

In his argument, the prosecutor did not personally guarantee the truth of the witness' testimony. We repeat that a prosecutor's personal observations of the witness' capacity to testify truthfully are objectionable and improper. In this case, we do not conclude that the remarks deprived the defendant of his right to a fair trial.

We first note the fact that the comments were, to an extent, invited by the defense counsel's closing argument. Part of the argument of the defendant's counsel improperly appealed to the emotions and prejudices of the jurors relative to their assessment of the witnesses'

credibility. He argued, with respect to Rivera, that she did not want to testify because she was not getting paid to do so. He further asked, albeit rhetorically, why she did not hold a regular job and why she earned money as a confidential informant. He argued: "Ask yourself, if you were [Rivera's] boss, and she came in and interviewed with you, would you hire her? And would you want her as a social friend? Would you invite her over for dinner? Now, if you answer no, that means you don't trust her credibility, her veracity, her truthfulness. And if you don't believe her—if you don't believe her word, then you can't convict [the defendant]." Defense counsel made a similar argument with respect to Clemonts, asking the jurors to consider whether they would let him into their homes at 2 o'clock in the morning to use the telephone.[14] The defendant's counsel later argued: "I will submit, you can't find [Rivera and Clemonts] credible because they have a bias, an interest and motive, and they do it for money." Accordingly, we rely on the fact that the prosecutor made his allegedly improper remarks only during rebuttal argument and in direct response to the defendant's counsel's accusation that the witnesses had lied.[15] See *State* v. *Crnkovic*, 68 Conn. App. 757, 771–72, 793 A.2d 1139, cert. denied, 260 Conn. 925, 797 A.2d 521 (2002).

We also are persuaded by the fact that those comments were limited to the prosecutor's rebuttal argument and that the defendant neither objected to the

[14] Defense counsel argued: "But here's the kicker. Not only does he have a get-out-of-jail-free card, but more importantly—well, just to add insult to injury, he gets paid for doing this. When he made his buys, he got paid $3780. Now, knowing this, ask yourself, if he knocked on your door at 2 o'clock in the morning and said he had an accident, would you let him in your house to use your phone? And if you answer no, that means you don't trust his credibility, his veracity, his truthfulness."

[15] In another part of his arguments to the jury, the defendant's counsel expressed his personal opinion as to the relative credibility of the state's witnesses. He described Steck as "the most credible one, the police officer [who has] taken an oath to enforce the law . . . ."

remarks at trial nor sought a mistrial. Further, we are mindful of the fact that the court carefully instructed the jury that it was its function to assess the credibility of the witnesses and that the arguments made by counsel did not constitute evidence. Having viewed the challenged remarks in light of the entire trial and in light of the court's instructions to the jury to disregard such comments, we conclude that the defendant has failed to prove that the prosecutor's remarks clearly deprived him of his right to a fair trial. See *State* v. *Whipper*, supra, 258 Conn. 274–75.

B

The defendant next claims that the prosecutor expressed his opinion as to the defendant's guilt. The prosecutor asked the jurors to "keep in mind who sold the dope" and made reference to the "types of people that [the defendant] sold drugs to." In closing, the prosecutor stated: "I would submit to you, the state has proven that this defendant is, in fact, guilty beyond a reasonable doubt of all counts. . . . Just keep one thing in mind. If it wasn't for people like [the defendant], there wouldn't be any [need for confidential informants to serve as witnesses]."

Despite the fact that counsel must be afforded generous latitude when delivering argument to the jury, the parameters of zealous advocacy are not without limit. "It is axiomatic that it is improper for a prosecutor to express his opinion, directly or indirectly, as to the guilt of the defendant." Id., 270. Such expression of opinion falls outside of the proper commentary on the evidence adduced at trial and is impermissible.

As a preliminary matter, the fact that during the heat of argument, the prosecutor referred to the defendant as the person who sold drugs or the person who occasioned the need for confidential informants to testify for the state does not convince us that the prosecutor

improperly expressed his opinion as to the defendant's guilt. We decline the defendant's invitation to dissect every sentence of the prosecutor's argument to discover impropriety. We view in a different light the prosecutor's comment that the state had proven its case beyond a reasonable doubt. That statement reflects the prosecutor's personal evaluation of the evidence and, as such, was improper.

We conclude, however, that the statement did not clearly deprive the defendant of a fair trial. The improper comment occurred only during rebuttal argument, and the prosecutor did not repeat that sentiment in his argument. The comment was not limited to a critical issue in the case, but reflected the prosecutor's naturally positive view of the state's case in general. We also observe that the remark followed the remarks of the defendant's counsel as to his opinion that Rivera and Clemonts had lied to the police, and his inference that the state had presented a weak case to the jury, a case that he personally did not find to be "good enough."[16] For all of those reasons, we conclude that the defendant has failed to demonstrate that the prosecutor's comments clearly deprived him of his right to a fair trial.

## C

The defendant also claims that the prosecutor improperly appealed to the emotions and prejudices of the jurors. The prosecutor stated: "[The defendant's counsel] had a lot to say. And he's working very hard

---

[16] The defendant's counsel stated: "I don't know if you've ever heard the phrase with the acronym KISS—keep it simple, stupid. And that's what I submit happened here. You have the confidential informants telling you a story, and it's exactly what the police officers want to hear. And now, it's exactly what the state wants to hear. It's what you heard.

"And it was good enough for the police and, obviously, it's good enough for the state now, but it wasn't good enough for me. That's why I asked so many questions. And I would submit, it shouldn't be good enough for you."

in defense of his client. And I find it rather curious that one of his comments [concerned] the good of the public because he's not here representing the public. He's here representing the defendant . . . . Let's keep these comments in perspective." The prosecutor also remarked: "I can't help but go back to [defense counsel's] reference to the public. Keep in mind, he's representing [the defendant], not the public. My last thought, [defense counsel] spent a lot of time talking about horrible people like Mr. Clemonts and Miss Rivera . . . . Just keep one thing in mind, if it wasn't for people like [the defendant], there wouldn't be any witnesses." The defendant also cites other portions of the prosecutor's argument that refer to the defense counsel's handling of the case.[17] The defendant argues that those comments invited the jury to view negatively both him and his counsel, to view him as someone separate from the public and caused the jury to question the sincerity of his counsel. He also argues that the state "used [his] constitutional rights—to counsel, to a trial and to present a defense, and the presumption of innocence—against him when this was not supposed to be a consideration for the jury."

The rule against a prosecutor appealing to the jury's emotions, passions or prejudices is firmly established. The prosecutor may argue in favor of a guilty verdict

---

[17] Specifically, the prosecutor discussed defense counsel's attempt to discredit the state's case as follows: "If this was a matter where there were long, drawn out complicated things, [defense counsel] is going to attack those on that basis. He's going to attack whatever he can find because that's his job. And [he has] got to do that job." Similarly, the prosecutor also commented on the defense counsel's attempts to discredit the state's witnesses with the use of their prior testimony. Likewise, the prosecutor commented: "Now, the defense spent time here searching. For what? I submit that he was searching for anything that he could find. And I submit to you, they didn't find anything." He also said, "Now again, I'm not being hard on [defense counsel]. He can only work with what [he has] been given. But unfortunately, he's like a contractor who has just been told, 'You've got to try and build a house on quicksand.' "

on the basis of the evidence adduced at trial; he or she may not do so by branding the defendant guilty with the use of "personal and degrading epithets" to describe the defendant. *State* v. *Alexander*, 254 Conn. 290, 307, 755 A.2d 868 (2000). Stated otherwise, the prosecutor's arguments should not invite the jury to decide the defendant's guilt or innocence on the basis of " 'powerful and irrelevant factors which are likely to skew' " its rational appraisal of the evidence. *State* v. *Brown*, 256 Conn. 291, 307, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001).

We do not conclude that the prosecutor's remarks were improper. The defendant's counsel, in his argument, asserted that Steck had conducted a sloppy investigation. His argument went so far as to hint at a conspiracy against the defendant.[18] He told the jury that it was "his job" to point out inconsistencies in the witness' testimony, "to demonstrate the truth and to show exactly what went on." The defense counsel devoted a good portion of his remarks to the motives underlying the testimony of Clemonts and Rivera. When

[18] Defense counsel argued: "Now, it may seem like now I'm going to criticize Officer Steck, which to a certain extent, I am. Do I think that Officer Steck could have done things better? Of course.

"You've heard testimony about—well, you've heard testimony that [Steck] wanted to enforce the law. He wanted to enforce narcotics trafficking offenses and make arrests. And he had a lot of tools at his disposal. He had confidential informants. But more importantly, he had confidential informants with an undercover police officer, corroboration.

"You can't get around that, that there's two people seeing the transaction. You have audiotape, which the confidential informants could've been wired up and you would've had voices. You would've known who was there. You could've had videotape."

Defense counsel further argued: "Now, I was raised to do things right, and if you're going to do it right, you do it yourself. Officer Steck could've done this himself, too. He could've prepared the warrant. He could've moved in. He could've gotten—allegedly gotten, [the defendant].

"Instead, Officer Steck used confidential informants, who have eyes and interests and motives to tell Officer Steck what he wants to hear. And now, what the state wants to hear."

commenting on Clemonts' cooperation with the police, defense counsel asked whether his cooperation was good for the public.[19] To that extent, the prosecutor's comments were invited.

Furthermore, it is unlikely that the prosecutor's comments invited the jury to hold against the defendant his exercise of his constitutional right to present a defense. The prosecutor's statements that defense counsel had a job to do and that defense counsel represented the defendant, rather than the public, when viewed in context, did not prejudice the defendant. The comments reflected generally on the defendant's attempts to discredit the state's witnesses and to criticize the police investigation. We are mindful that "[not] every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) Id., 310. Viewing those isolated remarks in the context of the trial, and considering that the court's charge to the jury sufficiently lessened any prejudice caused thereby, we conclude that they did not deprive the defendant of a fair trial. Cf. *State* v. *Alexander*, supra, 254 Conn. 307–308 (comments related to issue at hand involved such strong, negative imagery that they worked to undermine emotional neutrality of jury).

## D

The defendant next claims that the prosecutor attempted to "dilute the [state's] burden of proof by referring to what evidence the defendant failed to present to the jury." The defendant specifically points out

[19] The context of defense counsel's remark was as follows: "Now, let's look at Eddie Clemonts. Remember what he said? And I think the best came out during the very end. . . . What's convenient is that he remembers exactly what the police officer told him; to go in, come out with crack and then just spit it right back to the police officer. That's convenient. What else did he say? He said cooperating with the police is good for him. Now, it sure is good for him. But is it good for the public?"

that the prosecutor remarked that "[defense counsel] spent a lot of time talking about things that might be, things that possibly happened. Now, I explained to you, ladies and gentlemen, [defense counsel] has put forth no concrete theory as to what happened." The prosecutor also commented as to the fact that defense counsel failed to inquire of Clemonts or Rivera if they actually purchased the cocaine from the defendant.[20] Further, the prosecutor remarked that the defendant had failed to discredit the testimony of Clemonts or Rivera.[21] The prosecutor also criticized the manner in which the defendant's counsel cross-examined Rivera, arguing that defense counsel could have used a different photograph while inquiring as to where Steck had been parked when she was purchasing the cocaine.

We conclude that those remarks were not improper. First, the prosecutor prefaced his remarks by reminding the jury that "it's the responsibility of the state to prove the defendant guilty beyond a reasonable doubt. The defendant does not have to put on any evidence." Second, the remarks were fair descriptions of the evidence presented and fair criticisms of the defendant's theory

---

[20] The context of that challenged remark is as follows: "I'd submit to you that as far as [defense counsel's] transcript goes in reference to what he calls 'inconsistencies' is just something he used. Let's get back to what's relative and important in this matter.

"Now, the only person here who said, you know, these informants didn't buy this crack cocaine from someone else is [defense counsel]. And what he says, ladies and gentlemen, isn't evidence in this case. Now, you noticed in his examination—cross-examination of Mr. Clemonts and Miss Rivera— he never flat out asked them, isn't it true you didn't buy this crack cocaine from [the defendant]? . . .

"He never, throughout those extensive cross-examinations, [asked] that simple question. And I submit to you, it is because he knew that he was not going to change that aspect of their testimony. He knew that wasn't going to happen."

[21] The prosecutor stated: "To their credit, Mr. Clemonts and Miss Rivera came here and told you what happened on those days. And I submit to you, they told it in a credible and believable manner. And there's nothing [that has] been presented to rebut it, and there's nothing presented to show a bias."

of defense. A prosecutor cannot comment on a defendant's failure to testify or imply that a defendant bears the burden of disproving that he or she committed a crime. In contrast, he or she may comment on a defendant's failure to contradict the state's case or to support adequately his or her theory of defense. See *State* v. *Perry*, 58 Conn. App. 65, 70–71, 751 A.2d 843, cert. denied, 254 Conn. 914, 759 A.2d 508 (2000). Third, the court accurately instructed the jury that the state, not the defendant, carried the burden of proving its case against the defendant with proof beyond a reasonable doubt.

### E

The defendant also claims that the prosecutor improperly commented on the fact that the defendant exercised his right not to testify on his own behalf at trial. He points to one comment that the prosecutor made during rebuttal argument wherein he told the jury that the defendant did not need to present any defense.[22]

"It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. . . . Our legislature has given statutory recognition to this right by virtue of its enactment of General Statutes § 54-84. In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character

---

[22] The prosecutor commented: "Now, it's the responsibility of the state to prove the defendant guilty [beyond] a reasonable doubt. The defendant does not have to put on any evidence. As a judge I once knew used to say, the defendant can sit at the table, cross his arms, fold his legs, do nothing, and that's fine. You can't hold it against him. That's the law. That's what you have to follow.

"But [defense counsel] and [the defendant] did put on some defense. And they did cross-examine witnesses. And let's look at some of the things that they did."

that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? . . . Further, in applying this test, we must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 256 Conn. 310–11.

The defendant raises, but fails to address adequately, that issue. After noting the prosecutor's comment in a footnote of his brief, the defendant asserts that "[t]he state implied [that his] decision was a technical maneuver and not the exercise of a constitutional right, and this was not for the jury to consider." The prosecutor made reference to the fact that the defendant may "do nothing, and that's fine." The prosecutor did not specifically refer to the defendant's failure to take the witness stand. Having reviewed the remark in the overall context of the prosecutor's remarks, we are not persuaded that it conveyed to the jury any negative connotation as to the defendant's failure to testify. The prosecutor made the remark in the context of reminding the jury that the state bore the burden of proof, and he made the remark just before he critiqued the defendant's attempts to discredit the state's case. We conclude that the language was not intended to be, nor was it likely to be received, as improper commentary on the defendant's choice not to testify. Furthermore, we note that in its charge, the court adequately instructed the jury concerning the defendant's choice not to testify.[23]

---

[23] The court stated: "Now, as you know, in this case, the defendant, Mr. Morgan, chose not to testify. The law does not compel the defendant to take the [witness] stand and testify. And no presumption of guilt may be raised, and no adverse inference of any kind may be drawn from the fact that the defendant did not testify. You must not permit that fact to weigh

We conclude that the prosecutor's comments as to the credibility of the witnesses or his opinion as to the defendant's guilt, viewed separately or together, did not cause substantial prejudice to the defendant. Accordingly, the defendant has failed to demonstrate that a constitutional violation clearly exists and clearly deprived him of a fair trial.

The judgments are affirmed.

In this opinion the other judges concurred.

in the slightest degree against the defendant, nor should it enter into your discussions or deliberations."